STATE of Alaska, Appellant,

v.

Christopher SHETTERS, Appellee.

No. A–10378.

Court of Appeals of Alaska.

Oct. 8, 2010.

John K. Bodick, Assistant Attorney General, Criminal Division Central Office, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for the Appellant.

Tracey Wollenberg, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

MANNHEIMER, Judge.

AS 33.20.010(a) states that "a prisoner [who is] sentenced to a term of imprisonment that exceeds three days is entitled to a deduction of one-third of the term of imprisonment[,] rounded off to the nearest day[,] if the prisoner follows the rules of the correctional facility in which the prisoner is confined." For a defendant whose sentence is 2 years or more, this good time credit converts the remaining portion of the defendant's sentence from time spent in prison to time spent on mandatory parole. *See* AS 33.20.040(a), as construed in *Hill v. State*, 22 P.3d 24, 27 (Alaska App.2001). *See also State v. Staael*, 807 P.2d 513, 516–19 (Alaska App.1991) (holding that a prisoner has no right to refuse mandatory parole release when their good time credit equals the time remaining on their sentence of imprisonment).

The present appeal presents two questions relating to the calculation of a defendant's good time credit under AS 33.20.010(a) when they are released on mandatory parole, but when that mandatory parole is later revoked and they are returned to prison to serve the remainder of their sentence.

The first question is this: When a defendant is released on mandatory parole, and one of their conditions of parole is to reside in a correctional restitution center or halfway house, but later the defendant's parole is revoked and they are ordered to serve the remainder of their sentence in prison, is the defendant entitled to good time credit for the time they spent at the correctional restitution center or halfway house?

The second question is this: When a defendant is released on mandatory parole, but the defendant is later arrested on a parole revocation warrant and placed in custody in a correctional restitution center or halfway house (rather than in prison) pending the Parole Board's final decision on whether to revoke the defendant's parole, is the defendant entitled to good time credit for the time spent at the correctional restitution center or halfway house if the Parole Board ultimately decides to revoke the defendant's parole and orders them to serve their remaining sentence?

For the reasons explained in this opinion, we conclude that defendants in these two situations are "prisoners" who are "confined" in a "correctional facility" for purposes of the good time credit statute, and thus they are entitled to good time credit for the time they spent in the correctional restitution center or halfway house.

### Underlying facts

In 2005, Christopher Shetters was convicted of felony driving under the influence and was sentenced to serve 3 years in prison. After serving two-thirds of this sentence (in other words, with 365 days of his sentence remaining) Shetters was released on mandatory parole. In early 2008, the Alaska Parole Board took Shetters back into custody on suspicion that he had violated the conditions of parole.

On January 29, 2008, Shetters appeared before the Alaska Parole Board for a preliminary parole revocation hearing. At the conclusion of this hearing, the Parole Board found probable cause to believe that Shetters had violated his parole, but the Board released Shetters to a "CRC"—*i.e.*, a "correctional restitution center" established under AS 33.30.151—pending the Parole Board's final decision on whether to revoke Shetters's parole.

Shetters stayed at the restitution center for 37 days (from February 9th until March 16th), but then he was jailed for an unrelated misdemeanor offense.

On June 20th, the Parole Board held another preliminary parole revocation hearing in Shetters's case. Again, the Board released Shetters to a restitution center pending its final decision. Shetters began his second CRC residency on July 12th.

Eighteen days later, on July 30th, the Parole Board made its final decision: the Board decided to release Shetters on parole once again. As part of his conditions of parole, Shetters was directed to reside at the restitu-

tion center for an additional four months (starting July 30th).

Shetters resided at the restitution center until October 13th (for a total of 94 days, counting from July 12th), but then the Parole Board ordered Shetters back to prison for new parole violations. Shetters served the remainder of his sentence in prison.

In its calculation of Shetters's release date, the Department of Corrections gave Shetters a credit of 131 days against his sentence for the time he spent in residence at a correctional restitution center (i.e., the 37 days from February–March, plus the 94 days from July–October). However, the Department of Corrections did not give Shetters good time credit under AS 33.20.010(a) for these 131 days. What this meant, as a practical matter, was that Shetters's release date was delayed by 43 days—i.e., one-third of 37 days, rounded off, plus one-third of 94 days, again rounded off—compared to what his release date would have been if he had received good time credit for his days in the restitution center.

*Does AS 33.20.010, the statute granting good time credit to prisoners confined in a correctional facility, apply to defendants in Shetters's situation?*

■ In *Lock v. State,* 609 P.2d 539, 545 (Alaska 1980), our supreme court concluded that if, as a condition of a suspended imposition of sentence, a sentencing court orders a defendant to live in a residential facility where the restrictions on the defendant's freedom approximate the restrictions associated with imprisonment, then if the defendant's probation is later revoked and the defendant is ordered to serve a sentence of imprisonment, the defendant is entitled to credit against their sentence for the time spent in the residential facility.[1]

However, even though probationers are entitled to day-for-day credit against their sentences for the time they spent in jail-like residential facilities as a condition of probation, they are *not* entitled to a corresponding good time credit under AS 33.20.010. *Valencia v. State,* 91 P.3d 983, 983–84 (Alaska App.2004); AS 12.55.–086(c) ("Deductions for

good conduct under AS 33.20.010 do not constitute 'time served' [for purposes of the credit against a defendant's sentence of imprisonment when a suspended-imposition-of-sentence probation is revoked]."). *See also State v. Bourdon,* 193 P.3d 1209, 1213–14 (Alaska App.2008) (Mannheimer, J., concurring).

In *Valencia,* we gave two reasons for our conclusion that defendants are not entitled to good time credit for the time they spent in a jail-like residential facility as a condition of probation.

Our first reason was based on the wording of the good time credit statute, AS 33.20.010(a). Because the statute refers to "prisoners", we concluded that the statute was intended to apply "only to prisoners who are serving sentences in correctional facilities"—that is, only to defendants who are serving sentences of imprisonment, and not to probationers. *Valencia,* 91 P.3d at 984. Our second reason was that the policy behind awarding good time credit to defendants "applies uniquely to a prison situation":

> As we recognized in *Briggs v. Donnelly,* [828 P.2d 1207, 1209 (Alaska App.1992),] the legislative purpose of this statute is "to reward prisoners for good behavior during their terms of imprisonment ... [and to] give [correctional officials] a means of enforcing discipline within correctional facilities." The idea is to give prisoners an incentive to remain on good behavior—because prisoners know that their stay in prison will be extended if they lose their good time credit through misbehavior.
>
> On the other hand, defendants who are serving their sentences in court-ordered residential treatment programs already have a different incentive for good behavior. If they violate the rules of the treatment program, they can be expelled from the program, and expulsion from the program means that they will have to serve the remainder of their sentence in prison.

*Valencia,* 91 P.3d at 984 (footnotes replaced by bracketed text).

The facts of Shetters's case differ from the situation presented in *Valencia* because

---

1. The holding in *Lock* is now codified in AS 12.55.086(c).

Shetters was not a probationer, but rather a parolee released on mandatory parole. Shetters's appeal presents the question of how to categorize prisoners who are released on mandatory parole, but who are then placed in a jail-like residential facility (*i.e.,* one that qualifies as a "correctional facility") by the Parole Board as a condition of their mandatory parole, or who are later ordered into a jail-like residential facility by virtue of a pre-adjudication placement order issued by the Parole Board in a parole revocation proceeding.

Shetters argues that, in either of these two situations, if the defendant's parole is later revoked and the defendant is ordered to serve the remainder of their sentence, the defendant should be treated as a "prisoner" for the time they spent in the residential facility, and thus the defendant should receive commensurate good time credit. The State, on the other hand, argues that such defendants are in a position analogous to probationers, and therefore this Court's decision in *Valencia* governs their situation: in other words, the defendants are entitled to day-for-day credit against their sentence for the time they spent in the residential facility, but they are not entitled to good time credit.

Seemingly, this issue was already resolved by our decision in *State v. Bourdon,* 193 P.3d 1209 (Alaska App.2008).

The defendant in *Bourdon* was released from prison on parole, but he was later arrested on a parole revocation warrant. Following his arrest, Bourdon was placed at a halfway house while he awaited the Parole Board's decision whether to revoke his parole. *Id.* at 1210. About eight months later, the Parole Board revoked Bourdon's parole, and the Department of Corrections transferred him to a regular prison facility. *Ibid.*

The issue in *Bourdon* was whether Bourdon was entitled to good time credit for the eight months that he spent at the halfway house, awaiting the Parole Board's final decision. The State argued that Bourdon was not entitled to good time credit because, even though the Department of Corrections placed him in the halfway house, the halfway house was not directly operated by the Department of Corrections, but rather was a private institution operating as a correctional facility by virtue of a contract with the Department. *Ibid.*

We rejected this argument because the good time credit statute applies to all prisoners "confined" in a "correctional facility", and because the statutory definition of "correctional facility" (AS 33.30.901(4)) encompasses all facilities for housing prisoners, regardless of whether they are operated by the State or by others under contract with the State. *Id.* at 1210–11.

The State also relied on our decision in *Valencia,* but we pointed out that *Valencia* dealt with a defendant who was confined to a halfway house as a condition of probation imposed by the sentencing court, "[rather than being] placed [there] by the authority of the Department of Corrections". *Id.* at 1211.

In key respects, Shetters's situation appears to be analogous to the situation presented in *Bourdon.* Shetters was released on mandatory parole, and then he was later taken into custody on a parole revocation warrant and placed at a correctional restitution center pending the Parole Board's decision on whether to revoke his parole. Shetters remained at the restitution center in this post-arrest, pre-adjudication status from February 9th until March 16th (for a total of 37 days), and then again from July 12th until July 30th (another 19 days). Under *Bourdon,* Shetters would seemingly be entitled to good time credit for these 56 days.

The State argues, however, that *Bourdon* was wrongly decided—that this Court mistakenly focused solely on the issue of whether the halfway house was a "correctional facility", and that we overlooked the crucial fact that Bourdon was placed at the halfway house, not by the authority of the Department of Corrections, but rather by the authority of the Parole Board. The State argues that defendants who are confined by order of the Parole Board are not "prisoners" until the Parole Board makes the final decision to revoke their parole and orders them to resume serving their prison sen-

tence.[2]

We believe that the answer to the State's argument is found in our decision in *State v. Staael,* 807 P.2d 513 (Alaska App.1991).

The issue in *Staael* was whether a prisoner has the right to reject mandatory parole and choose, instead, to continue serving their sentence in prison—similar to a defendant's right under Alaska law to reject probation and to demand a prison sentence with no portion suspended.[3] This Court held that a prisoner does not have the right to reject mandatory parole. *Id.* at 516–19. For present purposes, the significant aspect of our decision in *Staael* is our rationale for concluding that a prisoner has no right to reject mandatory parole.

We first noted that, under the applicable statutes (AS 33.16.010(c) and AS 33.20.040(a)), mandatory parole is, indeed, mandatory: both of these statutes declare that when a prisoner is serving a sentence of 2 years or more, and when the prisoner's good time credit equals the time remaining in their sentence, the prisoner "*shall be released* on mandatory parole" for the remaining period of their sentence. (Emphasis added) As we stated in *Hill v. State,* 22 P.3d 24, 27 (Alaska App.2001), the effect of this good time credit is to convert the remaining portion of a prisoner's sentence from time spent in prison to time spent on mandatory parole.

We then noted in *Staael* that there was a crucial distinction between (1) the policy behind giving sentencing courts the discretion to place an offender on probation and (2) the policy behind requiring mandatory parole release for sentenced prisoners during the last portion of their sentence. *Staael,* 807 P.2d at 516–18.

We explained that probation is "an act of grace and clemency", intended as a more lenient alternative to imposition of the statutory penalty for the defendant's crime. *Id.* at 517.

In contrast, the purpose of mandatory parole "[is] not to provide a lesser penalty or [a more lenient] alternative to the statutory penalty." *Ibid.* Nor is mandatory parole "an *ad hoc* exercise of clemency". *Id.* at 518. Rather, mandatory parole is "an established variation on imprisonment"—a mechanism for achieving the rehabilitative goal of sentencing by helping offenders reintegrate into society. *Ibid.* Mandatory parole is an "integral part of the penological process", a procedure that applies uniformly to all prisoners whose sentence equals or exceeds 2 years and whose good time credit equals the time remaining in their sentence. *Id.* at 517.

As we noted in *Staael,* "The legislature has decided that all prisoners are to serve the last third of their sentences outside the prison, under the strict supervision of the Department of Corrections, as part of the rehabilitative goal." *Ibid.* Mandatory parole "is merely a variation of [an offender's correctional] treatment during the completion of the sentence." *Id.* at 518.

We then declared that, because mandatory parole is simply "a variation of the [offender's] sentence", and because a mandatory parolee "gains [their] freedom by statutory mandate", a prisoner facing release on mandatory parole "[has] no alternative but to serve out [their] sentence in [the] manner determined by the legislature". *Id.* at 518.

In other words, a prisoner who is released on mandatory parole is, in a technical sense,

---

**2.** We note that the State's briefs to this Court in *Bourdon* drew no distinction between (1) the Parole Board's placement of a prisoner pending the Board's resolution of a parole revocation proceeding and (2) the Commissioner of Corrections' placement of a prisoner after the prisoner's parole is formally revoked and the prisoner is ordered to resume serving their sentence. Nor did the State ever suggest that Bourdon's entitlement to good time credit hinged on such a distinction. In fact, even though the State now asserts that this Court reached the wrong decision in *Bourdon* because we failed to appreciate the importance of the fact that Bourdon was

placed at the halfway house by the Parole Board rather than the Commissioner of Corrections, the State's brief in *Bourdon* declared that "Bourdon was referred to Glacier Manor [*i.e.,* the halfway house] by the Department of Corrections." (Opening Brief of the State of Alaska in *State v. Bourdon,* Court of Appeals File No. 9950, at page 8.)

**3.** *See Brown v. State,* 559 P.2d 107 (Alaska 1977), where our supreme court held that a defendant has the right to refuse probation.

still serving their sentence—albeit not in prison.

We now return to the two questions presented in this appeal.

■ The first of these questions involves defendants who are released on mandatory parole, but whose conditions of parole require them to reside in a correctional restitution center or halfway house. We conclude, based on *Staael,* that if, as a condition of mandatory parole, the Parole Board requires an offender to reside in a correctional restitution center, a halfway house, or any other residential placement that qualifies as a "correctional facility" as defined in AS 33.30.901(4), then even though the offender has technically been "released" on parole, they are effectively serving their sentence in this correctional facility—and thus, under AS 33.20.010, they are entitled to good time credit for the time spent in that correctional facility if their parole is later revoked.

■ The second of these questions involves defendants who are released on mandatory parole and who are later arrested on suspicion of having violated the conditions of their parole. If, pending the Parole Board's final resolution of the parole revocation proceeding, the Parole Board places the offender in a correctional restitution center, a halfway house, or any other residential placement that qualifies as a "correctional facility", the offender is effectively serving their sentence in this correctional facility— and they are therefore entitled to good time credit for the time spent in that correctional facility if their parole is later revoked.

With particular regard to our resolution of this second question, we note that if we adopted the contrary rule proposed by the State—*i.e.,* a rule that gave such offenders only a day-for-day credit against their sentence if the Board later revoked their parole and ordered them to serve the remainder of their sentence—then any delays in the Parole Board's final resolution of the parole revocation proceeding would unjustifiably increase the punishment of the parolee.

For example, assume that an offender had 1 year remaining on their sentence when they were released on mandatory parole. Also assume that, following the initiation of parole revocation proceedings, the Parole Board ordered the offender placed in a restitution center or a halfway house pending the Board's final resolution of the revocation proceeding.

According to the calculation method described by the State's attorney at the oral argument in this case, if the Parole Board revoked the offender's parole 1 month later, then the offender would receive 1 month's day-for-day credit against their sentence for the time spent in the restitution center or halfway house, and the offender would be awarded good time credit against the remaining 11 months of their sentence—*i.e.,* approximately 112 days of good time credit. Thus, if the offender maintained good behavior and did not lose any of this good time credit, the offender would be released from prison after serving a total of a little over 8 months in custody—the 1 month of pre-adjudication residence at the halfway house, plus the remaining 11 months reduced by 112 days of good time credit (*i.e.,* a little over 7 months).

But if the Parole Board waited 4 months before revoking the offender's parole, then the offender would receive 4 months' day-for-day credit against their sentence for the time spent in the restitution center or halfway house, and the offender would be awarded good time credit against the remaining 8 months of their sentence—*i.e.,* approximately 80 days of good time credit. In that case, if the offender maintained good behavior and did not lose any of this good time credit, the offender would be released from prison after serving a total of a little over 9 months in custody—the 4 months of pre-adjudication residence at the halfway house, plus the remaining 8 months reduced by 80 days of good time credit (*i.e.,* a little over 5 months).

Thus, in this example, the State's proposed interpretation of the good time credit law gives rise to a disparity of 1 month in the total amount of time that the parole violator would have to serve in custody—a disparity that arises solely from the differing amount of time it took the Parole Board to issue its final decision in the parole revocation proceeding.

The fact that the State's proposed interpretation of the law gives rise to this unjustified disparity in the offender's sentence is an independent reason for this Court to reject the State's position. *See Endell v. Johnson,* 738 P.2d 769, 771 (Alaska App.1987) (rejecting a proposed interpretation of the "credit for time served" statute, AS 12.55.025(c), in part because it would have created an unjustified disparity between the total sentence served by defendants who remained incarcerated pending trial and those who were able to secure their pre-trial release on bail).

*Conclusion*

For the reasons explained here, we conclude that when the Parole Board orders a mandatory parolee to reside at a correctional restitution center, a halfway house, or any other non-prison correctional center, the mandatory parolee is entitled to both (1) credit for time served and (2) good time credit corresponding to the period of their enforced residence at the correctional center if the Board later revokes their parole and orders them to serve some or all of their remaining sentence. The judgement of the superior court is AFFIRMED.